Filed 3/30/23; Certified for Publication 4/19/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049755 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1913451) |
| v. | |
| DAVID COULTHARD, | |
| Defendant and Appellant. | |

A jury convicted defendant David Coulthard (Coulthard) of abducting his eight-year-old daughter after he failed to return the child to her mother in the United Kingdom (Pen. Code, § 278[1]). For this offense, the trial court suspended imposition of sentence and placed Coulthard on probation for two years.

On appeal, Coulthard raises six claims of error. He contends there was insufficient evidence for his conviction, his prosecution violated the prohibition against ex post facto laws, the trial court violated his rights to due process and to present a defense, the remote, two-way audio/video testimony of the child's mother violated his confrontation rights, and the cumulative effect of the asserted errors requires reversal of his conviction.

---

[1] Unspecified statutory references are to the Penal Code.

For the reasons explained below, we affirm the judgment.

## I.  FACTS AND PROCEDURAL BACKGROUND

A.  *Procedural History*

In April 2020, the Santa Clara County District Attorney filed an information charging Coulthard with a single count of felony child abduction of M.C. on or about and between April 16, 2019, and August 14, 2019 (§ 278; count 1).[2]

In September 2021, the jury found Coulthard guilty as charged.

In January 2022, the trial court suspended imposition of sentence and placed Coulthard on probation for two years with various conditions.

Coulthard timely appealed.

B.  *Evidence Presented at Trial*

1.  Prosecution Evidence

Coulthard and Marie Coulthard married in July 2010.[3]  Their child, M.C., was born in February 2011.  In 2014, while living in the United Kingdom (UK), Coulthard and Marie separated.  They divorced in 2015.  Coulthard subsequently married a woman who lives in the United States and moved to Campbell, California.

In the initial UK family court proceedings (which began in 2014), a judge ordered that M.C. should live with Marie and granted visitation to Coulthard.  In December 2017, Coulthard initiated a proceeding in the UK family court and requested that M.C. be allowed to live with him (in England) instead of with Marie.  After holding a hearing, on December 20, 2017, a UK family court judge ordered that M.C. should continue to live

---

[2] We refer to the child by her initials to protect her privacy interests.  (See Cal. Rules of Court, rule 8.90(b)(4).)

[3] We refer to Marie Coulthard by her first name to distinguish her from defendant Coulthard.

with Marie and Coulthard should continue to have visits with M.C. (hereafter the December 2017 custody order or the custody order).[4]

Twice prior to April 2019, the UK family court allowed Coulthard to take M.C. to the United States for visits. At the end of those visits, Coulthard returned M.C. to the UK. In April 2019, pursuant to the December 2017 custody order and with Marie's agreement, M.C. traveled to the United States with Coulthard for a visit scheduled from April 5, 2019, to April 16, 2019.[5]

On April 16, Marie received an e-mail from Coulthard stating that he would not be bringing M.C. back to the UK. Marie did not give Coulthard permission to keep M.C. in the United States beyond April 16. After receiving Coulthard's email, Marie contacted her attorneys, petitioned the UK "High Court," and, on April 17, obtained an emergency order from the High Court for the return of M.C. to the UK (hereafter the return order).[6]

On the morning of April 24, a Campbell Police Department officer served Coulthard with the return order at a residence in Campbell. When serving the return order, the officer explained to Coulthard some of the information in it, including that he had until April 26 to return M.C. to the UK. The officer also told Coulthard, "At that point [M.C.] would be deemed a ward of the court and all passports with her name will be surrendered. And if [Coulthard] failed to do so [(i.e., return M.C.)] by that time, that he would be held in contempt of the court, imprisoned, fined, and his assets could be seized." The officer testified that the return order itself indicated service on Coulthard was required by April 20, but the officer did not receive the order until April 24.

---

[4] The December 2017 custody order was admitted into evidence at Coulthard's trial.

[5] Unless otherwise indicated, all dates were in 2019.

[6] At trial, Coulthard objected to the admission of the return order on hearsay grounds, but the trial court overruled that objection and admitted the return order into evidence.

3

M.C. was not returned to the UK in April, and Marie did not have any contact with M.C. from April 5 through August 14. The Campbell Police Department investigated M.C.'s abduction and surveilled the residence in Campbell. On July 24, a police officer observed Coulthard leave the home and return with M.C.

Marie arrived in the United States on August 13. On August 14, the police recovered M.C. while she was at a school district office for testing and reunited her with Marie. That same day, the police arrested Coulthard.

2. Defense Evidence

Coulthard testified as the only defense witness. Coulthard said that he had lived in Mauritius from May 2010 to August 2011. He met Marie there and married her in July 2010. Coulthard explained that their relationship "started to get[] sour when [Marie] was one month into her pregnancy" with M.C. He said Marie's "lies started being quite clear." She "had extreme temper tantrum problems," but he "could not leave her" and "would not leave her. She was pregnant. [He] was not going to leave [his] daughter."

M.C. was born in Mauritius in February 2011, and Coulthard moved back to the UK in August 2011. One year later, Marie moved to the UK on a spousal visa. Marie brought M.C. with her to the UK. Subsequently, Coulthard declined to sign Marie's application for an extended visa because "[s]he had been abusing" him and M.C. "for 16 months" and "[t]hreatening to make false allegations against [him] if [he] did anything to stop her [from] getting her ten-year visa." In 2014, without notice to Coulthard, Marie obtained a temporary restraining order against him. However, a permanent order "was dismissed." Around the same time that she sought the restraining order, Marie submitted a UK visa application based on alleged domestic violence victimization. Although she obtained such a visa, it subsequently was revoked.

Coulthard testified that he believed the UK family court's December 2017 custody order had been fraudulently obtained because Marie's "2014 residency permit [] had been

4

revoked in 2016." Coulthard asserted he did not appeal the December 2017 custody order because he was not able to afford a lawyer.

On April 15, from California, Coulthard sent an e-mail to Marie explaining that he was not going to return M.C. to the UK. On April 24, the police served Coulthard with the return order, which was four days after the order should have been served according to its terms. Coulthard described the return order as based on a Marie's "fraudulent, no-notice, ex parte application." He also said that it "was impossible" for him to comply with the return order by the designated date.

Coulthard contacted a solicitor in the UK on April 22 and spoke to the solicitor four days later. The "purpose of the discussion" was "to talk about the validity of the Hague Convention and [Coulthard's] grounds to retain [M.C.]"[7] The solicitor informed Coulthard of two options for responding to the return order: engaging in the Hague Convention process that Marie had initiated or returning to the UK with M.C. Coulthard decided to pursue the option that related to the Hague Convention. He did not engage in the other option given the timing of the service of the return order and the potential for arrest if he returned to the UK with M.C. after the designated date.

Coulthard appealed the return order in the UK, and the case was referred to "an authority known as ICACU." Thereafter, a May 3 court order "adjourned [Marie's] application to have [M.C.] returned." Coulthard understood this to mean that the return order was no longer in effect. He also believed that Marie failed to follow through on a May 7 application she made to the ICACU. He asserted that Marie discontinued her

_____

[7] We understand Coulthard's reference to the "Hague Convention" as a reference to the Hague Convention on the Civil Aspects of International Child Abduction (22 U.S.C. § 9001 et seq.) (hereafter the Hague Convention or the Convention). Under the Hague Convention, "if a court finds that a child was wrongfully removed from the child's country of habitual residence, the court ordinarily must order the child's return. There are, however, exceptions to that rule." (*Golan v. Saada* (2022) ___ U.S.___, 142 S.Ct. 1880, 1887.)

5

efforts under the Hague Convention "[o]n advice of the prosecutor," the Campbell police intervened, and the prosecutor commenced this prosecution.

On cross-examination, Coulthard testified that during the December 2017 hearing in the UK family court, he told the judge about his concern that Marie did not have a valid domestic violence visa. Coulthard acknowledged that between the date of the December 2017 custody order and the beginning of M.C.'s visit in April 2019, he did not apply to modify or change the custody order, and he had never challenged the custody order. He also acknowledged he had agreed with Marie to return M.C. to the UK by April 17 and that in failing to return M.C. to Marie, he had violated the December 2017 custody order. He stated further that when he was arrested in August 2019, he was not aware of the potential criminal consequences of retaining M.C. in violation of the December 2017 custody order.

Coulthard said he married his second wife in August 2017. Between February and March 2018, he decided to live with her in Campbell; she applied on his behalf for a conditional green card. Shortly before M.C.'s April 2019 visit, Coulthard learned that he had been approved by the United States for an unconditional green card.

Coulthard acknowledged that the UK court's return order stated he had a right to " 'seek legal advice' " and warned that " '[t]his right does not entitle [him] to disobey any part of this order until [he] ha[s] sought legal advice.' " He understood the return order to mean "[t]hat it's important to get legal advice. I've got the right to legal advice. But I also need to obey what's been asked in it, in this civil court order, yes."

Coulthard testified further that he "talked to a specialist on the Hague Convention who said that America was obliged to stick to the rules of the Hague Conventions. And that means you have to give me the right to show my good faith reasons to retain [M.C.], and that never happened." When asked if he "thought there were no criminal consequences for [his] unlawful retention of [M.C.] here in the United States," Coulthard answered, "I had not committed a criminal offense; so, of course, that's what I believed."

6

Coulthard testified that, based on M.C.'s report of abuse by Marie, he decided to keep her in the United States for her protection. He acknowledged that in his April 2019 e-mail to Marie, he said that Marie could send letters to M.C., but he would " 'check any message' " she sent and only give them to M.C. " 'if appropriate.' " Coulthard also admitted that he and his wife (an elementary school teacher and a mandated child-abuse reporter) did not contact any child protective services agency, adding, "We did not want to retraumatize [M.C.] by doing that."

## II. DISCUSSION

In this appeal, Coulthard contends: (1) because the UK court's return order was never registered with a California court, that order has no force in California and there is no substantial evidence that he lacked a right of custody to M.C.; (2) because the Santa Clara County District Attorney sought to enforce orders of a foreign court, his prosecution for violating those orders violates the prohibition against ex post facto laws; (3) the district attorney's effort to enforce a foreign court order without complying with federal law violated his due process rights; (4) the trial court violated his right to present a defense; (5) the trial court violated his confrontation right when it allowed Marie to testify remotely and without first holding a hearing; and (6) the cumulative effect of the asserted errors requires reversal of his conviction.

We address Coulthard's claims in turn.

A. *Sufficiency of Evidence for Conviction Under Section 278*

Coulthard asserts that for him to be convicted under section 278, "the people must show that there was a valid custody order in place." He contends that because the UK High Court's return order "has not been registered it is unenforceable in this state" and "cannot be sufficient to sustain a conviction under [section] 278." He further argues that

7

because the return order is unenforceable in this state, "substantial evidence does not support the finding that [he] lacked a right of custody pursuant to [section] 278."[8]

The Attorney General responds that any lack of registration pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et. seq.) (UCCJEA) "does not invalidate an international custody order." The Attorney General further asserts that because the "custody order issued in the United Kingdom awarded primary custody to Marie and only visitation to" Coulthard, "[t]he evidence established that Marie Coulthard was M.C.'s lawful custodian and [Coulthard] had no right of custody."

### 1. Legal Principles

When reviewing the evidence for legal sufficiency, our task is limited. We determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) We make this determination using the statutory language (see *People v. Delgado* (2013) 213 Cal.App.4th 660, 667), because "the plain language of our statute must control as to the acts which constitute the crime." (*People v. Descheneau* (1921) 51 Cal.App. 437, 439, citing *People v. Barry* (1892) 94 Cal. 481; see also *People v. Arias* (2008) 45 Cal.4th 169, 177.) We apply de novo review to the meaning of statutory language. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

We further determine whether the entire record " 'contains substantial evidence— that is, evidence that is reasonable, credible, and of solid value—from which a reasonable

---

[8] Based upon his briefing, it appears that Coulthard's claim of error challenges only the lack of registration of the return order, not the December 2017 custody order. The Attorney General responds to Coulthard's claim with argument regarding the December 2017 custody order, not the return order. There is no evidence in the record indicating that either order was registered in California, and the jury instructions did not specifically describe the order. In closing argument, the prosecutor focused primarily on the December 2017 custody order but also mentioned the return order.

8

trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) "In applying this test, we . . . presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Ibid*.) " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid*.)

Section 278 sets forth the offense commonly known as child abduction or child stealing. "Child stealing has always been considered in California to be a crime against the parent, not the child. It is designed to protect parents against the anxiety and grief which necessarily follow from the taking of their children." (*People v. Campos* (1982) 131 Cal.App.3d 894, 899 (*Campos*).) Section 278 punishes "[e]very person, not having a right to custody, who maliciously takes, entices away, keeps, withholds, or conceals any child with the intent to detain or conceal that child from a lawful custodian." (§ 278; see also § 277 [defining terms appearing in § 278, including " 'right to custody' " and " '[l]awful custodian' "].[9])

---

[9] Section 277 provides, inter alia, the following definitions: "(b) 'Court order' or 'custody order' means a custody determination decree, judgment, or order issued by a court of competent jurisdiction . . . that affects the custody or visitation of a child, issued in the context of a custody proceeding. An order, once made, shall continue in effect until it expires, is modified, is rescinded, or terminates by operation of law. [¶] (c) 'Custody proceeding' means a proceeding in which a custody determination is an issue . . . . [¶] (d) 'Lawful custodian' means a person, guardian, or public agency having a right to custody of a child. [¶] (e) A 'right to custody' means the right to the physical care, custody, and control of a child pursuant to a custody order as defined in subdivision (b) . . . . [¶] . . . [¶] (h) 'Visitation' means the time for access to the child allotted to any person by court order." (§ 277.)

9

The trial court here instructed the jury on section 278 with CALCRIM No. 1250, stating: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] l. The defendant maliciously took, enticed away, kept, withheld, or concealed a child from her lawful custodian; [¶] 2. The child was under the age of 18; [¶] 3. When the defendant acted, he did not have a right to custody of that child; [¶] [and] [¶] 4. When the defendant acted, he intended to detain or conceal the child from the child's lawful custodian." (CALCRIM No. 1250.) The court further instructed, in pertinent part: "The right to custody means the right to physical care, custody, and control of the child according to the law or because of a court order. A parent with liberal visitation does not have a right to custody of the child. [¶] Visitation means the time ordered by a court granting someone access to the child." (*Ibid*., italics omitted.)

2.  Analysis

We are not persuaded that Coulthard's conviction for a violation of section 278 is unsupported by substantial evidence or otherwise legally insufficient because of a failure to register in California any UK court order. As described above, section 278 concerns child custody in two respects. First, the statute only applies to persons "not having a right to custody" of the child. (§ 278.) Second, a violation of section 278 requires that the accused person have acted with the intent to detain or conceal the child "from a lawful custodian." (*Ibid*.) Section 277 defines a " '[c]ourt order' or 'custody order' " in relevant part as "a custody determination decree, judgment, or order issued by a court of competent jurisdiction . . . that affects the custody or visitation of a child, issued in the context of a custody proceeding." (§ 277, subd. (b).) Neither section 277 nor section 278 mentions any provision of the UCCJEA or states that a non-California custody order must be registered with a California court for such an order to serve as proof of the elements of child abduction.

The evidence demonstrated that, as of April 17, Marie was M.C.'s lawful custodian, as that term is defined in section 277, subdivision (d). Specifically, Marie had

10

a " 'right to custody' " over M.C. (i.e., "the right to the physical care, custody, and control" of M.C.) "pursuant to a custody order as defined in [section 277,] subdivision (b)" (§ 277, subd. (e)), namely the UK family court's December 2017 custody order. That order said M.C. "shall live with the Mother Ms. Marie Emeline Coulthard." It also specified certain circumstances under which Marie had to "make the child available to spend time with [Coulthard]" and set forth directions regarding agreed-to vacations. More specifically, the custody order provided, inter alia: Coulthard and Marie (the " 'parties' ") " 'shall not remove [M.C.] from England and Wales without an order of the court or arrangement between the parties by email or text;' " "The parties are to provide each other with details of any intended holiday 3 weeks before the intended departure date" including a "copy of [the] return ticket for the child;" and "The father is to return the child's British passport to the mother 4pm 48 hours after he returns the child to the jurisdiction of England and Wales after any holiday."

The evidence further established that the UK family court that issued the December 2017 custody order is a "a court of competent jurisdiction." (§ 277, subd. (b).) Coulthard initiated the court proceeding that resulted in the December 2017 custody order, and both Marie and Coulthard testified about their participation in the UK family court's multi-day hearing. The custody order (which Coulthard did not appeal in the UK courts) and the corresponding trial testimony provided substantial evidence that the UK family court was a legitimate one, empowered to adjudicate the custody of M.C. (See *Lightfoot v. Cendant Mortgage Corp.* (2017) 580 U.S. 82, 91 ["A court of competent jurisdiction is a court with the power to adjudicate the case before it."]; see also *Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 494 ["Generally, '[a] foreign judgment will be res judicata in an American court if it has that effect in its country of rendition, and if it meets the American standard of fair trial before a court of competent jurisdiction.' "].)

The trial evidence further showed that the December 2017 custody order affected the "custody or visitation" of M.C. and was issued by the UK family court "in the context

11

of a custody proceeding." (§ 277, subd. (b).) As mentioned, in making its order after the multi-day proceeding, the UK family court rejected Coulthard's request that M.C. be allowed to live with him and directed that M.C. should live with Marie. The order required Marie to make M.C. available to spend time with Coulthard under certain conditions and allowed for agreed-to vacations outside England and Wales.

In accordance with the directives in the December 2017 custody order, Marie agreed to M.C.'s April 2019 trip to the United States with Coulthard for the period of April 5 to April 16. Further, regarding the conditions governing M.C.'s trip, Coulthard admitted at trial that he had agreed with Marie to return M.C. to the UK by April 17 but did not do so. He also admitted that he had violated the December 2017 custody order by retaining M.C. beyond April 17. Thus, all the requirements for proving that Marie was the lawful custodian of M.C. and Coulthard maliciously kept or withheld M.C. with the intent to detain or conceal her from Marie were satisfied by substantial evidence.

Relatedly, there is substantial evidence proving that Coulthard had no " 'right to custody' " (§ 277, subd. (e)) of M.C. after the agreed-upon return date because, under the December 2017 custody order, M.C. was supposed to live with Marie, and Coulthard had agreed to return M.C. to Marie by April 17. That is, as of April 17, Marie (not Coulthard) had "the right to the physical care, custody, and control" of M.C. pursuant to the custody order and the parties' agreement about the trip to the United States. (*Ibid.*) Thus, irrespective of the subsequent UK High Court's return order, issued on April 17, the district attorney presented sufficient proof of Coulthard's guilt, beyond a reasonable doubt, for violation of section 278 as charged in the information.

Furthermore, we reject Coulthard's argument that his conviction is unsupported because "[n]o evidence was presented that the [return order] was registered in California." The status of the return order does not affect the substantiality of the evidence against Coulthard. Coulthard's guilt is sufficiently supported by the December

12

2017 custody order and the other evidence concerning Marie's and Coulthard's custody rights.

In any event, the lack of registration in California of either the December 2017 custody order or the return order under the UCCJEA is immaterial to the question of whether the district attorney satisfied the elements of section 278 at Coulthard's trial. As noted above, section 277, subdivision (b), makes no mention of the UCCJEA or any registration requirement under that act when defining a " '[c]ourt order' or 'custody order' " for the purposes of determining who is a " '[l]awful custodian' " (*id.*, subd. (d)) or a person "not having a right to custody" under section 278. Moreover, the UCCJEA does not contain a criminal sanction. Instead, the UCCJEA governs a separate civil legal process for child custody determinations.

"The UCCJEA determines the proper jurisdictional situs as between interested states for litigation of child custody determinations—which includes virtually any custody or visitation dispute." (*In re Marriage of Kent* (2019) 35 Cal.App.5th 487, 493; see also *In re Marriage of Nurie* (2009) 176 Cal.App.4th 478, 491.) A foreign country is treated as if it were a state of the United States for purposes of applying certain provisions of the UCCJEA, and a child custody determination made in a foreign country under factual circumstances in substantial conformity with the jurisdictional standards of the UCCJEA must be recognized and enforced in California unless the foreign country's child custody law violates fundamental principles of human rights. (Fam. Code, § 3405.) Additionally, Family Code section 3445 sets forth a procedure for registering an out-of-state custody order. "Once an out-of-state custody order is registered in California under the UCCJEA[,] . . . as a matter of full faith and credit, the order determining child custody is enforceable in California as a California judgment by way of any relief normally available under California law." (*Kent*, at p. 494.)

The UCCJEA affords certain powers to district attorneys, but the Family Code makes clear that those powers do not limit the authority of district attorneys in other

contexts. Specifically, in a case arising under the UCCJEA or involving the Hague Convention, a district attorney is "authorized" to proceed, under Family Code section 3130, to act with respect to children taken or detained in violation of a custody order but "may not represent any party." (Fam. Code, § 3455.) In addition, Family Code section 3135 provides that the UCCJEA "does not limit the authority of a district attorney or arresting agency to act pursuant to this chapter, [s]ection 279.6 of the Penal Code, or any other applicable law." (Fam. Code, § 3135.) As such, the Family Code distinguishes but does not limit the powers of the district attorney in the criminal law context.

The issue of Coulthard's guilt or innocence under section 278 is not one that concerns the existence or exercise of jurisdiction for a child custody determination. Nor is it one regarding enforcement of a custody order by an involved party or by the district attorney in an effort to "locate the party and the child and to procure compliance with the order to appear with the child for purposes of adjudication of custody." (Fam. Code, § 3130.) Rather, the issue in this criminal prosecution of Coulthard is whether a UK court order and other evidence satisfies the terms of sections 277 and 278. Because the terms of sections 277 and 278 do not explicitly or implicitly reference the UCCJEA, "[w]e cannot insert what has been omitted . . . or rewrite the statute to conform to a presumed intention that is not expressed." (*Lewis v. Clarke* (2003) 108 Cal.App.4th 563, 567.)

We thus conclude that, under section 278, the prosecution was not required to prove that a foreign court order or custody order used to prove Coulthard's guilt had previously been registered in California pursuant to the UCCJEA. (See *People v. Lortz* (1982) 137 Cal.App.3d 363, 368–369 [concluding that, under former section 278.5, subdivision (a), "it was not necessary for the mother to first obtain a judicial finding by the family law court that the visitation order had been violated by defendant before a criminal charge could be filed against him"]; *id* at p. 369 [and stating that the "pure purpose of the statute is to provide for criminal sanctions for violations of custody and

14

visitation orders" and "the criminal sanctions were intended to be in addition to the civil contempt and modification already provided for under family law"].)

In sum, the evidence here proved that, under the terms of section 278, Coulthard did not, during the dates charged in the information, have a right to custody of M.C. The jury heard substantial evidence that on those dates Marie was M.C.'s lawful custodian and Coulthard maliciously kept or withheld M.C. with the intent to detain or conceal her from Marie. We thus conclude that there is sufficient evidence from which a reasonable juror could find beyond a reasonable doubt that Coulthard violated section 278.

B. *Ex Post Facto and Due Process Right to Notice*

Coulthard contends that "[e]ven if this Court were to hold that an unregistered foreign court order is a valid custody order for the purposes of [section] 278, the conviction still must be vacated [because] it violates the prohibition against ex-post facto laws." He asserts that "[t]here is no reasonable interpretation of [section] 278 that would put [him] on notice that violating an order of a court of the United Kingdom, that has never been registered with any Court in the United States, could subject him to criminal penalties in this country."

"The basic principle that a criminal statute must give fair warning of the conduct that it makes a crime has often been recognized by [the United States Supreme] Court." (*Bouie v. City of Columbia* (1964) 378 U.S. 347, 350–351.) That constitutional protection is one based on due process principles, not the Ex Post Facto Clause. "Although 'limitations on ex post facto judicial decisionmaking are inherent in the notion of due process,' the due process clause does not require the application of strict ex post facto principles in the context of judicial decisionmaking. [Citation.] Rather, judicial decisions are reviewed under 'core due process concepts of notice, foreseeability, and, in particular, the right to fair warning.' " (*People v. Sandoval* (2007) 41 Cal.4th 825, 855, quoting *Rogers v. Tennessee* (2001) 532 U.S. 451, 456, 459 (*Rogers*).)

15

On the other hand, the Ex Post Facto Clause prohibits "[a]ny law that applies to events occurring before its enactment and which disadvantages the offender either by altering the definition of criminal conduct or increasing the punishment for the crime." (*People v. Rojas* (2015) 237 Cal.App.4th 1298, 1306; see U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)  In *Rogers*, the United Supreme Court explained that "[t]he "Ex Post Facto Clause, by its own terms, does not apply to courts.  Extending the Clause to courts through the rubric of due process thus would circumvent the clear constitutional text.  It also would evince too little regard for the important institutional and contextual differences between legislating, on the one hand, and common law decisionmaking, on the other."  (*Rogers*, *supra*, 532 U.S. at p. 460, italics omitted.)  The Supreme Court thus concluded "that a judicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.' "  (*Id.* at p. 462.)

To the extent that Coulthard relies on the Ex Post Facto Clause to support his claim of error, we reject his contention because he fails to show any legislative change to section 278 that made criminal what was an innocent action when that action was undertaken.

We also reject Coulthard's due process argument that "no reasonable interpretation" of section 278 provided him fair warning that he could be found guilty based on an unregistered UK court order.  As explained *ante* (see pt. II.A.2), section 277 defines a " 'custody order' " broadly and does not suggest that a non-California custody order must be "registered" before it can provide a basis for determining whether a person has a " 'right to custody.' "  Further, Coulthard does not point us to any case holding that a person who retains a child in violation of an unregistered, out-of-state custody order could not properly be convicted under section 278.

Because it was entirely foreseeable under the terms of section 278 that Coulthard could be convicted based on a custody order "issued by a court of competent jurisdiction" outside of California, we conclude that there was no violation of Coulthard's due process right to fair notice. (See *People v. Yarbrough* (2012) 54 Cal.4th 889, 895, fn. 1; *People v. Wharton* (1991) 53 Cal.3d 522, 586.)

C. *Due Process and Federal Law Preemption*

Coulthard contends that "[a]ny enforcement of a foreign court[']s unregistered custody order, without following the Hague Convention[']s notice and procedure requirements, violates the Supremacy Clause of the United States Constitution" and is preempted by federal law. In addition, Coulthard asserts that because this case is governed by the provisions of the Hague Convention, his due process rights were "violated when he did not receive a hearing prior to M.C.'s removal" (capitalization omitted) and "the only appropriate remedy is that the charges against [him] be dismissed."

"The Hague Convention provides a legal mechanism for the prompt return of a child taken by one parent across international borders in violation of the other parent's custodial rights. [Citations.] A petitioner under the Hague Convention bears the burden of proving the child's wrongful removal or retention by a preponderance of the evidence. [Citation.] If the petitioner succeeds in showing a wrongful removal, the Hague Convention requires repatriation of the child to its country of habitual residence unless an exception to repatriation exists. [Citation.] One exception is that the child's repatriation presents a grave risk of physical or psychological harm to the child. [Citation.] This exception must be established by clear and convincing evidence." (*In re Marriage of Emilie D.L.M. & Carlos C.* (2021) 64 Cal.App.5th 876, 881–882.) Furthermore, "[i]t is the Convention's core premise that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.' " (*Monasky v. Taglieri* (2020) ___ U.S. ___, 140 S.Ct. 719, 723.)

17

Regarding preemption, Coulthard contends that "[t]he application of [section] 278, without following Hague Convention procedure would result in obstacle preemption." Under the principle of obstacle preemption, "a state may not adopt laws impairing 'the accomplishment and execution of the full purposes and objectives of Congress.' " (*People v. Rinehart* (2016) 1 Cal.5th 652, 660.) "In ascertaining whether preemption applies, '[c]ongressional intent is the touchstone.' [Citations.] Obstacle preemption can play an important role in preventing states from creating, inadvertently or otherwise, functional impediments that materially constrain legitimate federal objectives. But it can also lead to the overzealous displacement of state law to a degree never contemplated by Congress. Accordingly, the threshold for establishing obstacle preemption is demanding: 'It requires proof Congress had particular purposes and objectives in mind, a demonstration that leaving state law in place would compromise those objectives, and reason to discount the possibility the Congress that enacted the legislation was aware of the background tapestry of state law and content to let that law remain as it was.' " (*Id.* at p. 661; see also *Guardianship of Ariana K.* (2004) 120 Cal.App.4th 690, 706 (*Ariana K.*) ["A treaty may be not be construed as preempting state law or any court procedures in the absence of a clear intent to do so."].) Coulthard "bears the burden of demonstrating preemption." (*Rinehart*, at p. 660.)

Coulthard's preemption argument depends on the premise that the Hague Convention and section 278 address the "same subject matter" (capitalization omitted). We reject that conclusion. "The goal of the Hague Convention is to protect children from the effects of their wrongful removal from their nation of habitual residence. [Citations.] The expressly stated primary objects of the Hague Convention are two-fold. The first object is to secure the return of a wrongfully removed child who is retained in a nation who is a signatory to the treaty. The second object is to ensure that custody and visitation rights under the law of treaty signatories are respected by other parties to the Hague Convention." (*Ariana K.*, *supra*, 120 Cal.App.4th at pp. 704–705, fn. omitted.) Put

differently, "the Hague Convention is a civil remedy adopted to effect the return of children brought to other countries." (*United States v. Ventre* (9th Cir. 2003) 338 F.3d 1047, 1052, italics omitted.) "The Convention includes no criminal punishment for the abducting parent, nor does it provide for the resolution of the underlying custody dispute. Its sole objective is to 'restore the factual situation that existed prior to a child's removal or retention.' " (*United States v. Amer* (2d Cir. 1997) 110 F.3d 873, 881.)

By contrast, California's longstanding criminal prohibition against child abduction in section 278 is directed at punishing any person who, without a right to custody, maliciously takes a child with the intent to keep that child from their lawful custodian. (See § 278.) As such, section 278 vindicates the rights of the victimized custodian, not the child. (See *In re Michele D.* (2002) 29 Cal.4th 600, 614; *Campos*, *supra*, 131 Cal.App.3d at p. 899; see also Stats. 1976, ch. 1399, § 10, p. 6315.)

Given the distinction between the purposes of the Hague Convention and California's penal law, we conclude that Coulthard has not carried his burden of establishing congressional purposes and objectives that require our state's penal law be displaced by the Convention. Because the Hague Convention does not preempt or govern the criminal prosecution of Coulthard, we also reject Coulthard's claim that he was denied due process because he did not receive a hearing pursuant to the Hague Convention.

D. *Right to Present a Defense*

Coulthard contends that the trial court denied his constitutional right to present a defense by: (1) failing to give him "a Hague Convention hearing" which "would have provided him defenses that are otherwise not available" and "would have also allowed him to elicit testimony to be used in his defense"; (2) denying him an opportunity to show that the laws of the UK granted him a right to custody; and (3) foreclosing him from proving his innocence based on the necessity to protect M.C. from harm. We address Coulthard's contentions in turn.

19

### 1. Hague Convention Hearing

In the trial court, Coulthard did not request a separate hearing under the Hague Convention to present evidence about the alleged grave risk of harm posed by M.C.'s return to Marie and M.C.'s objection to any return. Because Coulthard failed to request such a hearing, we deem his appellate claim of error forfeited. (See *People v. Lazarus* (2015) 238 Cal.App.4th 734, 787.) Even if Coulthard's claim were not forfeited, we would reject it because he does not provide any authority or persuasive argument that a superior court presiding over a criminal prosecution must hold a hearing under the Hague Convention when no application under the Convention is pending in any court. (See 22 U.S.C. § 9003; see also *Municipal Court v. Superior Court (Gonzalez)* (1993) 5 Cal.4th 1126, 1131 ["The courts' role is to decide cases; the parties' role is to bring cases before the courts."].)

### 2. Expert Testimony on UK Law

Coulthard claims the trial court erred by denying him "the opportunity to present the proper interpretation of United Kingdom law as it applies to the custody order." He asserts that he was "prepared to present evidence that there is a difference in the interpretation of the family court agreements between the United Kingdom [and] California." He further asserts that under the Hague Convention, UK laws must apply and "California has no interest in applying its own law concerning the orders governing M.C.'s custody."

#### a. Background

Pretrial, Coulthard filed an in limine motion stating his intention to call "an expert witness with regard to British family law and its application to this particular case." The prosecutor moved in limine to exclude any defense evidence on the meaning of " 'right to custody' " under UK law. The prosecutor noted that the December 2017 custody order directed that M.C. "shall live with" Marie and further asserted that any separate " 'parental responsibility' " rights that Coulthard may have had under UK law were

20

equivalent to " 'legal custody' " in California, which does not amount to a right to "physical care, custody, and control" under section 277, subdivision (e). The prosecutor supported this argument with a discussion of *People v. Irwin* (1984) 155 Cal.App.3d 891 (*Irwin*), which explained that "[t]he status of '*legal*' custodian is extraneous to the manifest purpose of section 278 which has to do with *physical* custody." (*Id.* at p. 896, italics added.)

At a hearing on the in limine motions, Coulthard's defense counsel said that "physical custody" of M.C. was "disputed" in this case and the defense had an expert witness "ready to testify and ready to indicate that, under these circumstances, it's reasonable for a judge in London to not necessarily award custody, but it's a defense for retention of the child." Counsel also conceded that the December 2017 custody order was a valid order but explained that the defense was "contesting that [Coulthard] did not have a right to retain custody of his daughter." Counsel further explained that "the crux of the defense is an expert witness who is familiar with family law -- the rules, regulations, so forth -- in the United Kingdom. And he will testify that under the Hague Convention there is a defense to retention of a child in breach of an otherwise valid court order and that defense in the cases in which the child -- it's the state of mind of the child -- has a reasonable belief of being abused, if that -- of being in grave danger if that child is returned back to the custodial parent, then the noncustodial parent can retain custody of that child. And it's again a defense to the breach of the order. That's . . . the crux of the defense here. [¶] . . . [¶] . . . It goes to an element of the crime which requires Mr. Coulthard interfere with a right of an individual who has custody. [¶] . . . [O]ur contention here is that the mother did not have custody because the child believed that she was in grave danger -- that she would be in grave danger if she were returned to the mother."

The trial court granted the prosecutor's in limine motion to exclude the testimony, stating: "This case is going to be dictated by California law, California law as it will

21

acknowledge and pertain to the foreign decrees or judgments of the United Kingdom. [¶] We are not going to relitigate the merits of that United Kingdom judgment or order. The defendant had and has a right to challenge those orders in a court of law pertaining to -- or in the United Kingdom pertaining to this family law matter, and we're not going to relitigate that issue here. [¶] The question is was there a valid order, and it appears that it was."

After defense counsel asked for clarification of the trial court's ruling, the court continued: "[T]he People have to prove that the defendant -- when he acted, he did not have a right to custody. The People have argued that he had no right because the decree of the court that had the jurisdiction over the family law case in which custody and visitation were litigated was set forth in that order, and that was -- that is what will bind this court in establishing that right. [¶] . . . [¶] . . . If there's an exception to the breach of those orders, those get litigated in the court that has the jurisdiction, and that's the United Kingdom. That existence of the order is what is binding here, and that's what we're going to present to the jury."

After the prosecutor described certain procedures under the Hague Convention and noted that Marie had initiated a Hague Convention petition in the UK for M.C.'s return, the trial court reiterated: "I don't need to know about the Hague Convention and its articles and provisions in the context of this criminal case here because that's not really issues [*sic*] that are litigated in these proceedings. [¶] It's not to say that you don't have an alternative forum or [Coulthard] doesn't have an alternative forum and remedy under this Hague Convention process that's outlined by counsel, but that's not really of an issue before the Court that I have to be concerned with in dealing with now. [¶] That's the gist of why the Court is taking the view that it is and granting this motion excluding defense evidence of this right to custody under the law of the United Kingdom. That's not really at issue before this Court in this proceeding."

22

b. Legal Principles

A criminal defendant must be afforded a meaningful opportunity to present a complete defense, subject to the limitations imposed by the rules of evidence. (See *People v. Lucas* (1995) 12 Cal.4th 415, 464.) Only relevant evidence is admissible at a trial. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id*., § 210.) Further, expert witness testimony is admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id*., § 801, subd. (a).) "Like other evidence, expert testimony must be relevant." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 390.)

" 'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.' " (*People v. Brown* (2014) 59 Cal.4th 86, 101.) "A trial court's decision to admit or exclude evidence . . . will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.) "It is settled that the exclusion of irrelevant evidence does not . . . impair an accused's due process right to present a defense." (*People v. Gonzales* (2019) 34 Cal.App.5th 1081, 1090; see also *People v. Jones* (1998) 17 Cal.4th 279, 305.)

c. Analysis

The trial court did not err when deciding the in limine motions. Viewing the court's ruling in the context of defense counsel's proffer of expert testimony, Coulthard's claim of error is not persuasive because the information before the court demonstrated the existence of a valid custody order within the meaning of sections 277 and 278 that provided Marie physical custody of M.C. during the period charged in the information. Under section 277, subdivision (b), a custody order, "once made, shall continue in effect

23

until it expires, is modified, is rescinded, or terminates by operation of law." (§ 277, subd. (b).)

Further, defense counsel's assertion that Coulthard, under UK law, may have been able to raise a defense to a violation of the December 2017 custody order is inherently speculative and collateral to the validity of the custody order during the relevant period. Under the elements of section 278, the relevant question is the status of Coulthard's and Marie's right to physical custody pursuant to a custody order at the time Coulthard took M.C. (See *People v. Ryan* (1999) 76 Cal.App.4th 1304, 1314, citing *Irwin*, *supra*, 155 Cal.App.3d at pp. 896–897.) Coulthard ultimately testified that he never challenged the December 2017 custody order in a UK court. Given the speculative and collateral nature of the proffered expert testimony, the trial court could reasonably have relied on *Irwin* at page 891to rule that the proposed testimony about some possible (yet unadjudicated) defense to a violation of an otherwise valid custody order was irrelevant under applicable California law. For these reasons, we conclude that the trial court did not abuse its discretion or otherwise violate Coulthard's right to present a defense by excluding the proffered defense expert testimony about UK law.

### 3. Necessity Defense

#### a. Background

In a pretrial in limine motion, Coulthard asked to present evidence of a necessity defense, asserting multiple instances of abuse by Marie on M.C. and himself and stating that M.C. had indicated she did not want to return to her mother. Relatedly, the prosecutor moved in limine to preclude the assertion of a necessity defense, arguing that Coulthard would not be able to prove every element of that defense.

When initially addressing the in limine motions in court, the trial court said Coulthard had not "completely laid out the particulars of the affirmative defense" in his motion and the court would "need a little bit more information as to what the proposed

24

evidence and testimony will be on that issue." The court thus deferred ruling on the necessity defense issue.

At a subsequent pretrial proceeding, the trial court stated its agreement with the prosecutor that "the bulk of these incidents" proffered by Coulthard in his motion did not "rise to the level of the proof that's required . . . [for a] necessity defense." Nevertheless, the court reiterated that if Coulthard's defense counsel wanted to proffer further, more substantive evidence, the court would not "deny him that opportunity to do so." The court also told counsel that it "will want to know the specific information as it pertains to what is the underlying basis that leaves or addresses the immediate grave harm that's at issue." Counsel responded to the court by saying, "Okay. Understood." The court then continued consideration of the necessity issue to the next day.

On the following day, the trial court reiterated that the parties needed to "address what [the] actual nature of the immediate emergency is that gives rise to this necessity." The prosecutor argued that Coulthard could not rely on hearsay evidence to claim that an emergency existed (which is an objective standard) and instead had to make "an offer of proof that somebody competent is going to testify that these things actually occurred." Defense counsel responded that "the emergency is the psychological trauma, not whether [M.C.] was actually hit, not whether she was actually sexually abused, but the psychological trauma that resulted from whatever conduct [Marie] imposed." Counsel argued further that the defense did not "need to prove that those things actually occurred. We need to prove that [M.C.] suffered psychological trauma and that Mr. Coulthard was attempting to prevent that from occurring again in the future by retaining her in the United States." The prosecutor responded by reiterating that "if there's no . . . admissible evidence that establish[es] that these acts actually occurred, then there's no necessity defense."

After the trial court said that it agreed with the prosecutor's analysis and would preclude the necessity defense unless defense counsel had a "different offer of proof,"

25

counsel indicated that he "may need to get [M.C.] to testify. 10-year-old girl. Via video." The court stated that it needed to hold a hearing with M.C. because when "a party says a child says something [that] doesn't necessarily mean that the child said it, one; two, remembers; three -- four, can articulate what it is that the child is supposed to recall. [¶] This is a very young child. She's been through a lot of trauma already. And so I would ask that you give that some serious consideration, because there are a lot of procedural obstacles that need to be overcome before the Court is going to allow that. And so . . . the trial will not be delayed any further for that. We're moving forward. We've got a jury coming in tomorrow. [¶] So do you have any other evidence to offer this morning?" After counsel answered "No," the court continued, "All right. So the Court's tentative ruling, then, is that the defense's motion to allow admission of necessity evidence is denied. And, by virtue of that, the People's corresponding motion is granted." Coulthard made no further offer of proof during his trial regarding the necessity defense.

### b. Analysis

On appeal, Coulthard claims that the trial court "agreed with the prosecution's argument that there was no imminent evil [] from which Mr. Coulthard could claim M.C. required protection" and erroneously "made this ruling because it did not recognize the novelty of the international nature of this case." Coulthard asserts further that because he did not receive a hearing under the Hague Convention, he was not able to "establish the elements of the necessity defense prior to the prosecution here."

We are not persuaded by Coulthard's contentions. Setting aside that Coulthard failed to make any argument in the trial court tying a Hague Convention hearing to his proposed necessity defense, as we have explained *ante*, no hearing under the Hague Convention was required in this case. (See pts. II.C & II.D.1.)

26

Furthermore, when viewed in the context of Coulthard's proffer to the trial court, there is no merit to his contention that regardless of the Hauge Convention, he would have been able to "prove all elements of the necessity defense."

In analyzing Coulthard's contention, we must discern whether he proffered " 'evidence deserving of consideration from which reasonable jurors could conclude [that the elements of the necessity defense] have been satisfied.' " (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1539.)  If a defendant fails to establish those elements, the trial court is justified in excluding the evidence and not allowing the jury to consider the issue of necessity.  (*People v. Patrick* (1981) 126 Cal.App.3d 952, 960–962 (*Patrick*).)

"The necessity defense is very limited and depends on the lack of a legal alternative to committing the crime.  It excuses criminal conduct if it is justified by a need to avoid an imminent peril and there is no time to resort to the legal authorities or such resort would be futile." (*People v. Beach* (1987) 194 Cal.App.3d 955, 971, superseded by statute on another point as stated in *People v. Neidinger* (2006) 40 Cal.4th 67, 76–77; see also *Patrick*, *supra*, 126 Cal.App.3d at pp. 960–961.)

"To assert a defense of necessity, the defendant must show, by a preponderance of the evidence, that he or she 'violated the law (1) to prevent a significant and imminent evil, (2) with no reasonable legal alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief that the criminal act was necessary to prevent the greater harm, (5) with such belief being objectively reasonable, and (6) under circumstances in which [he or] she did not substantially contribute to the emergency.' " (*People v. Buena Vista Mines, Inc.* (1998) 60 Cal.App.4th 1198, 1202.)

Coulthard failed to offer proof establishing all the elements of the necessity defense.  The trial court correctly observed that Coulthard's proffer about the imminent risk of abuse and harm that M.C. might suffer was based, at least in part, on her hearsay statements that could not be offered to prove the truth of the matter, i.e., the peril she faced by being with Marie.  Moreover, Coulthard failed to show that he had no

27

reasonable legal alternative to prevent any potential harm to M.C. other than keeping her in the United States. For example, Coulthard made no showing that pursuing legal remedies in a UK or California court or contacting child protective services in either locale was not a viable option. In fact, Coulthard admits in his appellate briefing that he had the option "to again seek redress in the Courts of the United Kingdom" but claims "this would simply not be reasonable" because he "is a legal permanent resident of the United States" and "should not be required to seek redress from a foreign sovereign to protect his child when she is present in the United States." Leaving aside that M.C. was in California because Coulthard brought and kept her here, that a particular remedy may not have been the most convenient or preferred by Coulthard does not make it an unreasonable alternative to violating California law.

Coulthard did not proffer evidence satisfying all the requisite elements of a necessity defense. We thus conclude that the trial court did not abuse its discretion or violate Coulthard's constitutional rights in excluding evidence regarding a necessity defense.

E. *Remote Witness Testimony and Right to Confrontation*

Coulthard contends the trial court violated his constitutional right to confront witnesses against him by allowing Marie to testify remotely without first holding an evidentiary hearing. He further claims that even if a hearing had been held, the prosecution failed to proffer any evidence showing the necessity or reliability of Marie's remote testimony.

The Attorney General responds that the trial court "did hold a hearing and 'hear evidence' . . . on Marie's specific health and travel limitations" (as relayed by the prosecutor), and Coulthard nonetheless forfeited his argument for an evidentiary hearing by failing to request such a hearing in the trial court. Additionally, the Attorney General asserts that the trial court properly made a case-specific determination that Marie's

28

remote testimony was necessary, and the admission of her testimony did not violate the Confrontation Clause.

### 1. Background

Pretrial, in August 2021, the prosecutor filed points and authorities in support of a motion to allow Marie to testify remotely via two-way audio/video communication technology. The prosecutor argued that Marie's remote testimony would not violate Coulthard's constitutional right to confront witnesses because the case circumstances met the requirement for a case-specific finding of the necessity under *Maryland v. Craig* (1990) 497 U.S. 836 (*Craig*).[10] The prosecutor asserted that Marie's remote testimony was a "reasonable measure that mitigates the risk of spreading [coronavirus disease 2019 (COVID-19)] without unnecessarily infringing upon a defendant's constitutional rights," was justified by the "current state of emergency," and was authorized by an emergency court rule.[11] The prosecutor further asserted that Marie was unwilling to travel from the

---

[10] In *Craig*, the United States Supreme Court addressed "whether the Confrontation Clause of the Sixth Amendment categorically prohibits a child witness in a child abuse case from testifying against a defendant at trial, outside the defendant's physical presence, by one-way closed circuit television." (*Craig*, *supra*, 497 U.S. at p. 840.)

[11] Former Emergency Rule 3 of the California Rules of Court provided, in relevant part: "Notwithstanding any other law, in order to protect the health and safety of the public, including court users, both in custody and out of custody defendants, witnesses, court personnel, judicial officers, and others, courts must conduct judicial proceedings and court operations as follows: [¶] (1) Courts may require that judicial proceedings and court operations be conducted remotely. [¶] (2) In criminal proceedings, courts must receive the consent of the defendant to conduct the proceeding remotely and otherwise comply with emergency rule 5. Notwithstanding Penal Code sections 865 and 977 or any other law, the court may conduct any criminal proceeding remotely. As used in this rule, 'consent of the defendant' means that the consent of the defendant is required only for the waiver of the defendant's appearance as provided in emergency rule 5. For good cause shown, the court may require any witness to personally appear in a particular proceeding. [¶] (3) Conducting proceedings remotely includes, but is not limited to, the use of video, audio, and telephonic means for remote appearances; [and] the electronic exchange and authentication of documentary evidence." (Cal. Rules of Court, Appen. I, former Emergency rule 3(a).)

UK to the United States to testify because she was not vaccinated against COVID-19, had sole physical custody of two children (who were too young to be vaccinated for COVID-19), cared for her third child every other week, did not have family or friends in the UK who could care for her two children or the money to pay for childcare if she were required to travel to California to testify, and would have had to quarantine for 10 days upon her return to the UK. In addition, the prosecutor noted that Marie "cannot be compelled to travel to the United States because she is beyond this Court's subpoena power." Coulthard opposed the prosecutor's motion.[12]

At a pretrial court proceeding, the prosecutor further explained that she could not force Marie to apply for the "national interest exemption" to a presidential proclamation that had suspended travel to the United States for certain persons from the UK. In addition, the prosecutor stated that she was "trying to determine how to even go about applying for the law enforcement exception" to the presidential proclamation and had not yet "received any information about what steps are necessary to meet that exception, if any."

Coulthard's defense counsel argued that there was no legal precedent stating that "the mere existence of the pandemic is sufficient to abridge" a defendant's constitutional right to confrontation. Counsel also argued, inter alia, that the prosecutor had failed to show due diligence in pursuing the exceptions to the presidential proclamation and failed to provide evidence "with regards to whether remote testimony is necessary to protect the public health." Counsel noted that Marie "ha[d] previously been found to be manipulative and untrustworthy by a court in the United Kingdom," had chosen not to get vaccinated, and "shouldn't be in the driver's seat with regard to whether Mr. Coulthard

---

[12] Although the record on appeal indicates that Coulthard's defense counsel filed a written opposition to the prosecutor's motion for remote testimony, that opposition is not included in the record. Coulthard has not filed any motion in this court to augment the record to include his written opposition. (See Cal. Rules of Court, rules 8.340(c) & 8.320(b).) Moreover, he does not reference the opposition in his appellate briefing.

can confront her on the stand in front of a jury." Counsel also asserted that the audio/video computer program proposed for Marie's testimony was "an insufficient medium."

The trial court granted the prosecutor's motion for Marie's remote testimony, providing an extensive oral explanation of its ruling. The court observed the issue was a "complicated" one because it involved the "competing issues" of Coulthard's rights to a speedy trial and witness confrontation. The court conducted a "case-by-case" analysis of the confrontation issue. It addressed the state of the COVID-19 pandemic, noting that it had to consider and weigh the "realistic and practical concerns and factors" caused by the pandemic against Coulthard's right to confront witnesses at his trial.

The court noted that Marie is "a mother of three young children who has indicated her concerns and her refusal, frankly, to travel to the United States to testify in these proceedings and the whole absence of a process to compel her to do so." The court also cited Coulthard's right to confront her and have the jurors "assess her credibility, [] view her demeanor, [] see her attitude and her emotional responses to questions, all of the indicia and characteristics that the court instructions speak to that are factors that the trier of fact gets to assess."

The trial court continued: "The question becomes is live testimony an absolute requirement of the Sixth [Amendment]. And I think the case law has indicated that there are exceptions and exemptions from that. [¶] Does this particular case present the high-bar circumstances that [defense counsel] has indicated, and the Court believes that it does. [¶] It is clear that this witness is a necessary witness. It is clear to this Court that, given her refusal to travel to the United States -- even if she were assisted by a third party in acquiring a visa, there is no indication that she would otherwise travel under the current circumstances of the pandemic, one; two, that it would pose a hardship to her in the sense that [] she has no funds to travel, one -- if that were overcome, she still has no funds to pay for child care, two. Three, upon her return, she would have to isolate for a

31

two-week period is what's currently prescribed, and during that period she would not have [childcare] -- the means to pay for [childcare]."

The trial court described defense counsel's comment about Marie being in the driver's seat as "an unfair characterization" when juxtaposed with "defendant's actions in keeping the child here." The court expressed concern "about the reliability and efficacy of an overseas remote proceeding" but explained that "assuming we get a good connection and good [application], . . . [Coulthard], through his counsel, and the jurors will have the opportunity then to confront the witness. The witness will be visible. She'll be available to answer questions. [¶] And there is, frankly, [] not a less-restrictive process available that will at the same time serve the paramount concern. And that is for the ascertainment of the truth. And we have to afford [Coulthard] his right to a speedy trial, his right to confront and to cross-examine witnesses. In light of the circumstances that we've been addressing, this is the least-restrictive alternative available to effectuate that process. [¶] So the Court believes that it is authorized to grant that relief in view of the emergency orders necessitated because of the pandemic, and to do so under these circumstances -- and albeit they are limited to this case -- does not violate the confrontation clause."

Later, at trial, Marie testified remotely from the UK via two-way audio/video technology. She began her testimony alone in a room at a friend's house but then moved to a room in her own home during the direct examination because of glitches with the initial audio transmission. After Marie completed her testimony, the trial court described the "connection and reception" from Marie's home as "flawless." The court also explained that there was "ample time and opportunity for . . . the jurors to observe the witness. There was clarity in the picture. There was clarity in the audio. The witness was able to be seen by all parties. Counsel was given substantial time to examine the witness on all subjects that were approved by the Court."

## 2. Legal Principles

The Confrontation Clause of the Sixth Amendment to the United States Constitution " 'provides two types of protections for a criminal defendant:  the right physically to face those who testify against him, and the right to conduct cross-examination.' " (*Coy v. Iowa* (1988) 487 U.S. 1012, 1017.)  "The right to a face-to-face meeting between accused and accuser follows from the confrontation clause's 'primary object': ' "to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." ' " (*People v. Bharth* (2021) 68 Cal.App.5th 801, 814 (*Bharth*), quoting *Craig*, *supra*, 497 U.S. at p. 845; see also *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358.)

"[W]hile 'face-to-face confrontation forms "the core of the values furthered by the Confrontation Clause" . . ., it is not the *sine qua non* of the confrontation right.' [Citations.]  Rather, ' "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial," [citation], a preference that "must occasionally give way to considerations of public policy and the necessities of a case." ' [Citations.]  The face-to-face requirement can be dispensed with, but 'only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.' [Citations.]  This public policy exception is not a general one; it must be applied on a case-by-case basis." (*People v. Alvarez* (2022) 75 Cal.App.5th 28, 35–36 (*Alvarez*), citing *Craig*, *supra*, 497 U.S. at pp. 847–850.)

"The 'ultimate goal' of the confrontation clause, ensuring the reliability of evidence [citation], 'is a procedural rather than a substantive guarantee.  It commands,

33

not that evidence be reliable, but that reliability be assessed in a particular manner: by subjecting it to the crucible of cross-examination' and other procedural safeguards. [Citation.] Those procedural safeguards are: (1) in-person testimony; (2) given under oath; (3) subjected to cross-examination; and (4) the ability of the defendant and fact finder to view witness demeanor for the purpose of evaluating credibility. [Citation.] The 'combined effect' of these elements of confrontation 'ensur[es] that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings.' " (*Alvarez*, *supra*, 75 Cal.App.5th at p. 37.)

" 'We review de novo a claim under the Confrontation Clause that involves mixed questions of law and fact. [Citation.] Under this standard, we defer to the trial court's determination of "the historical facts" . . . but not the court's "application of [the] objective, constitutionally based legal test to [those] historical facts." ' " (*Bharth*, *supra*, 68 Cal.App.5th at p. 813; see also *Alvarez*, *supra*, 75 Cal.App.5th at p. 36 [de novo review applies when there are no disputed facts].)

3. Analysis

We begin by considering Coulthard's argument that the trial court erred by failing to provide him with an evidentiary hearing before it allowed Marie's remote testimony. Coulthard asserts that this failure "should be sufficient for this Court to vacate [his] conviction [and] order a new trial." However, Coulthard does not cite to any evidence in the record that he asked for an evidentiary hearing before the trial court decided that Marie could testify remotely. Under these circumstances, we agree with the Attorney General that Coulthard's claim of error regarding an evidentiary hearing is forfeited by his failure to request such a hearing in the trial court. (See *People v. Lord* (1994) 30 Cal.App.4th 1718, 1722; see also *People v. Hinton* (2006) 37 Cal.4th 839, 898.)

We turn to the question whether the trial court erred by permitting Marie's *two-way* audio/video, remote testimony based on the prosecution's showing. As an initial

34

matter, we note that the parties have not cited and we have not located any California appellate court decision examining whether remote testimony in a criminal case during the COVID-19 pandemic violates the Confrontation Clause. We also observe that the parties rely on *Craig*'s two-part analysis of necessity and reliability, even though *Craig* addressed the use of *one-way* closed-circuit television for witness testimony. (See *Craig*, *supra*, 497 U.S. at pp. 846, 851, 855, 857.) Given the lack of any dispute between the parties (either at trial or on appeal) about the application of *Craig*'s two-part analysis, we will assume for purposes of resolving Coulthard's claim on appeal that that test applies. (See *State v. Tate* (Minn. 2023) 985 N.W.2d 291, 294, 299–301 (*Tate*) [adopting *Craig*'s two-part analysis in a case involving witness trial testimony via two-way, remote video technology during the COVID-19 pandemic]; see also *United States v. Carter* (9th Cir. 2018) 907 F.3d 1199, 1206 ["We now make clear that a defendant's right to physically confront an adverse witness (whether child or adult) cannot be compromised by permitting the witness to testify by video (whether one-way or two-way) unless *Craig*'s standard is satisfied."]; *People v. Lujan* (2012) 211 Cal.App.4th 1499, 1504–1506 [discussing *Craig* in the context of two-way video testimony and holding that child witnesses shown to be traumatized by face-to-face confrontation may testify remotely, whether or not those witnesses are victims of an independent crime committed by the defendant]; *People v. Powell* (2011) 194 Cal.App.4th 1268, 1281 [stating that "*Craig*'s general principles apply" in the context of testimony via two-way closed-circuit television].)

Coulthard asserts that "the prosecution has failed to present any evidence to demonstrate that denial of confrontation is necessary for public safety, or to show that the reliability of testimony is otherwise preserved." We are not persuaded.

Regarding the necessity prong of the *Craig* analysis, the People bear the burden to make an adequate showing that Marie's remote testimony was necessary in this case. (See *Craig*, *supra*, 497 U.S. at p. 855.) At the time of Coulthard's trial in August-

September 2021, "the pandemic was not a thing of the past nor had the court returned to business-as-usual." (*Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108, 1129.) The prosecutor here proffered information regarding the pending state of emergency and travel restrictions between the UK and United States, including that Marie (who was unvaccinated) would have to quarantine for several days upon her return to the UK from California. That information confirmed that "[t]he COVID-19 health emergency continued to persist and governmental entities continued to be subject to health orders to limit transmission risk of COVID-19 and contain COVID-19 outbreaks." (*Ibid.*) The prosecutor also asserted, among other things, that Marie was the primary caretaker of two of her children (both of whom were too young to be vaccinated against COVID-19) and did not have the means to arrange for alternate childcare. Further, Marie's testimony could not be supplanted with testimony from some other person, and Coulthard had asserted his right to a speedy trial. As such, there was no reasonable alternative to Marie's remote testimony at the time the trial court ruled. Under these circumstances, we conclude that the People met their burden to show that in this case Marie's remote testimony was necessary to advance an important public policy. (See *People v. Kocontes* (2022) 86 Cal.App.5th 787, 872 ["Ensuring the health of all courtroom users during the COVID-19 pandemic was an important public policy concern."]; *Tate*, *supra*, 985 N.W.2d at p. 303; see also *Roman Catholic Diocese of Brooklyn v. Cuomo* (2020) ___ U.S. ___, 141 S.Ct. 63, 67 ["[s]temming the spread of COVID–19 is unquestionably a compelling interest"].)

As for *Craig*'s reliability prong, although Marie was not physically present in court, she provided sworn testimony while situated in a room alone without any distractions. The trial court specifically found that the courtroom audio and video of Marie's testimony were of high quality, and the jurors could see Marie clearly. Coulthard does not argue that these findings were unsupported by substantial evidence. Although there were some initial technical problems with the audio transmission, the trial court

36

confirmed that "there was sufficient opportunity . . . for the responses to be repeated and the questions to be repeated such that there was effective examination." In addition, counsel for the parties were able to send materials electronically to Marie for her review during her testimony. All told, the trial court here ensured that Marie's remote testimony was reliable and subject to adversarial testing by Coulthard and his defense counsel. (See *Tate*, *supra*, 985 N.W.2d at pp. 304–305.) We decide that, on these facts, Coulthard's constitutional right to confront witnesses against him was not violated when the trial court allowed Marie to testify remotely.

F. *Cumulative Prejudice*

Having concluded *ante* that Coulthard's claims of error lack merit, we in turn reject his claim of cumulative prejudice resulting from the asserted errors. There is no prejudicial error to cumulate. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

## III. DISPOSITION

The judgment is affirmed.

_____

                        Danner, J.

WE CONCUR:

_____

Greenwood, P.J.

_____

Bamattre-Manoukian, J.

**H049755**
*People v. Coulthard*

Filed 4/19/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID COULTHARD,<br><br>    Defendant and Appellant. | H049755<br>(Santa Clara County<br>Super. Ct. No. C1913451) |

BY THE COURT:

The opinion in this case filed March 30, 2023, was not certified for publication. After the court's review of a request under California Rules of Court, rule 8.1120(a), and it appearing that the opinion meets the standards for publication under California Rules of Court, rule 8.1105, it is therefore ordered that the opinion be published in the Official Reports.

_____

Danner, J.


_____

Greenwood, P.J.


_____

Bamattre-Manoukian, J.


**H049755**
*People v. Coulthard*

Trial Court:    Santa Clara County Superior Court

Trial Judge:    Hon. Jesus Valencia, Jr.

Counsel:    Evan D. Williams, The Law Office of Evan D. Williams, for Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Moona Nandi, Deputy Attorney General and Bridget Billeter, Deputy Attorney General, for Respondent.

**H049755**
*People v. Coulthard*